**Walter SHERIDAN et al., Plaintiffs,**

v.

**Jim GARRISON, Indiv., et al., Defendants.**

**Civ. A. No. 67-1147.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Aug. 28, 1967.

Milton E. Brener, Herbert J. Miller, Gibbons Burke, Edward M. Baldwin, New Orleans, La., for plaintiffs.

Numa Bertel, James Alcock, Richard Burnes, New Orleans, La., for defendants.

RUBIN, District Judge:

The plaintiffs, Walter Sheridan, a television news reporter employed by the National Broadcasting Company ("NBC"), and Richard Townley, a news reporter employed by television station WDSU–TV, New Orleans, Louisiana, seek to enjoin the District Attorney for the Parish of Orleans, State of Louisiana, and the foreman of the Grand Jury presently convened in that parish, from:

A. Enforcing or seeking to enforce a subpoena issued to Walter Sheridan on July 18, 1967, commanding him to appear before the Grand Jury;

B. Taking action to prosecute criminal proceedings which have commenced against Sheridan in Orleans Parish, Louisiana, by bill of information charging him with public bribery of Perry R. Russo, and against Townley by bills of information charging him with public bribery of Perry R. Russo, threatening Marlene Mancusso, a witness in the case of State v. Novel and threatening Perry R. Russo, a witness in the case of State v. Shaw; and

C. Taking any steps or further efforts whatever to harass, intimidate, and deter plaintiffs in the exercise of their constitutionally protected rights, privileges, and immunities.

The plaintiffs contend that the defendants have taken or may take steps to violate their rights under the Constitution of the United States, as set forth in the Fourteenth Amendment. This Amendment, of course, provides a guarantee of due process of law, and assures federal protection against state action to the rights protected against federal action by the First, Fifth, and Sixth Amendments to the Constitution of the United States. The plaintiffs also invoke the Civil Rights Act of 1871[1] and 28 U.S.C. § 1343,[2] the pertinent provisions of which are set forth in the footnotes.

The background leading to this action is well-known. The District Attorney of Orleans Parish has commenced an investigation of an alleged plot to assassinate the late President John F. Kennedy. This investigation has been a matter of

[1] 42 U.S.C. § 1983 provides:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[2] 28 U.S.C.A. § 1343 provides in part:
"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
" * * * (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
"(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

great public interest. The plaintiffs have participated in television broadcasts dealing with events that have occurred during the course of the investigation and actions taken by the District Attorney's office.

On July 7, 1967, the District Attorney filed a bill of information against Sheridan charging him with public bribery of Perry R. Russo. On July 11, 1967, three bills of information were filed against Townley charging him with (1) public bribery of Perry R. Russo, (2) threatening Marlene Mancusso, a witness in the case of State v. Novel, and (3) threatening Perry R. Russo, a witness in the case of State v. Shaw. On July 18, 1967, a subpoena was issued ordering Sheridan to appear before the Orleans Parish Grand Jury.

The plaintiffs claim that the District Attorney harbors malice and personal animosity against them motivated by their free exercise of their rights of free speech and free press, that he has sought to harass and intimidate them and to prevent their free exercise of their constitutional rights by a series of actions including a plan to arrest them on a spurious charge, and a plan to handcuff and physically beat them. They contend that the District Attorney has repeatedly stated that he intends to "get" Sheridan, that the charges against both Sheridan and Townley are "totally lacking in substance," and "were filed not for legitimate purposes of good faith prosecution but rather in furtherance of the * * * scheme of harassment and intimidation of the plaintiffs," that the criminal charge against Sheridan and two of the charges against Townley are based on the testimony of a person with respect to whom the District Attorney has withheld and suppressed evidence that is destructive of his credibility. Sheridan al-

leges that he has attempted to obtain relief in Louisiana courts from the enforcement of the grand jury subpoena, without avail, but apparently no other effort to obtain relief in state courts has been made.

The plaintiffs have filed a motion for summary judgment that they are entitled to the injunction preventing enforcement of the subpoena against Sheridan. The defendants have filed a motion for summary judgment asking that the complaint be dismissed. There is of course a substantial dispute between the parties as to virtually all of the allegations of the plaintiffs' complaint. But those facts which are controlling with respect to the determination of the merits of the motions for summary judgment on these two issues are not in dispute, and a summary judgment on them is therefore proper.[3]

## SUBPOENA AGAINST SHERIDAN

Some of the facts here are simple and undisputed. Eleven days after Sheridan was charged with public bribery of Perry R. Russo, the Orleans Parish Grand Jury issued a subpoena, commanding Sheridan to appear before it. On August 9, 1967, Sheridan was ordered to show cause why he should not be held in contempt for failure to appear.

The grand jury originated centuries ago in England. It was originally both an investigating body, with the responsibility for originating charges, and a deliberating body, with the responsibility for determining the guilt or innocence of the accused, but before the settlement of the English colonies in America it had lost its function in the trial of persons charged with crimes and had become only an investigatory and accusatory body.[4] In this capacity, it provides a means of protecting the public against unfounded

3. Charles A. Lawes Co. v. Detex Watchclock Corp., 7 Cir., 1962, 300 F.2d 393, Braniff v. Jackson Ave.-Gretna Ferry, Inc., 5 Cir., 1960, 280 F.2d 523; Huffman v. Ford Motor Co., 6 Cir., 1952, 195 F.2d 170.

4. Morse, "A Survey of the Grand Jury System," 10 Org.Law Review 101, 1931; 38 C.J.S. Grand Juries § 1, p. 982.

accusation and of bringing to trial persons charged with crimes.[5]

■ The Louisiana Constitution provides for a grand jury composed of twelve persons, nine of whom constitute a quorum.[6] As it is at common law, the grand jury in this state is an informing and accusing body.[7] Although charges for other offenses may be originated by the District Attorney by information only,[8] the Louisiana Constitution provides that "no person shall be held to answer for capital crime, unless on presentment or indictment by a grand jury."[9] The grand jury's inquisitorial power is not limited to crimes brought to its attention by the district attorney, however, and it may "inquire into other offenses triable by the district court of the parish."[10]

Louisiana courts issue a subpoena for a witness to appear before the grand jury upon request either of the grand jury or the district attorney.[11] A witness who

is to testify is first put on oath by the foreman.[12] Only certain persons may be present at sessions of the grand jury: the members of the grand jury, the district attorney and his assistants, the witness under examination, the reporter, and, when needed, an interpreter.[13] Any other person who is intentionally present is in constructive contempt of court.[14]

■ It necessarily follows from the Louisiana statutes that a person summoned to testify as a witness before a grand jury may not have counsel present. Neither may he refuse to testify at all,[15] although he may refuse to answer specific questions on the grounds that the answers to those questions might tend to incriminate him.[16]

■ The Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment,[17] guarantees the accused the "Assistance of Counsel." Three years ago, the United States Supreme Court

5. Hurtado v. People of State of California, 1884, 110 U.S. 516, 4 S.Ct. 111, 292, 28 L.Ed. 232; Ex Parte Bain, 1887, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849; 28 American Jurisprudence, "Grand Jury," Section 3.

6. La.Constitution of 1921, Art. 7, § 42.

7. State v. Nunez, 1920, 147 La. 394, 85 So. 52. See also Code of Criminal Procedure, Art. 444. "The grand jury is an accusatory body and not a censor of public morals."

8. Louisiana Code of Criminal Procedure, Art. 382.

9. "Except in cases arising in the militia when in actual service in time of war or public danger." Louisiana Constitution of 1921, Art. 1, § 9.

10. Louisiana Code of Criminal Procedure, Art. 437, and Comment (a) Art. 438.

11. Id. Art. 439.

12. Id. Art. 440.

13. Id. Art. 433. See also State v. Revere, 1957, 232 La. 184, 94 So.2d 25, construing the antecedent statutory provision strictly to exclude an operator of a recording machine. The text of the Code article now expressly permits such a

person to be present by embracing "[a] person sworn to record the proceedings of, and the testimony given before, the grand jury."

14. Ibid.

15. This is the rule in a majority of jurisdictions. United States v. Pappadio, 2 Cir., 1965, 346 F.2d 5, vacated on other grounds, Shillitani v. United States, 1965, 384 U.S. 364, 86 S.Ct. 1531, 16 L. Ed.2d 622; United States v. Scully, 2 Cir., 1955, 225 F.2d 113, cert. denied 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788; Marcello v. United States, 5 Cir., 1952, 196 F.2d 437; Shushan v. United States, 5 Cir., 1941, 117 F.2d 110, 133 A.L.R. 1040; Mulloney v. United States, 1 Cir., 1935, 79 F.2d 566; O'Connell v. United States, 2 Cir., 1930, 40 F.2d 201; see also, Annotation: Privilege Against Self-Incrimination as to Testimony Before Grand Jury, 38 A.L.R.2d 225, 237.

16. Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110; United States v. Monia, 1943, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376; also, cases and annotation cited in Note 15 supra.

17. Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799.

held in Escobedo v. State of Illinois[18] that the right to counsel includes the right of a person who is accused of committing a crime to consult with his lawyer during the course of an interrogation conducted before he is formally charged. "[E]very person accused of a crime, whether state or federal, is entitled to a lawyer at trial."[19] The right to counsel at the formal trial would be "a very hollow thing [if] for all practical purposes, the conviction is already assured" by the interrogation of the accused.[20]

*Escobedo* holds that where an investigation "is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has * * * [an] absolute constitutional right to remain silent." He must not only be granted this right: he must be expressly advised of it. Here Sheridan is not only the focus of suspicion: he is formally charged with the crime of public bribery. Under *Escobedo*, the law enforcement officers of the State have a duty to advise him that he has an absolute constitutional right to remain silent in any police interrogation.

The rights declared in *Escobedo* were affirmed in Miranda v. State of Arizona[21] where the Supreme Court focused on the Fifth Amendment's privilege against self-incrimination in addition to the right to the assistance of counsel covered by the Sixth Amendment.[22] The Court there called attention to the fact, obvious on the face of the Bill of Rights and the Fourteenth Amendment, that by its very nature the Constitution imposes restraints on our government in dealing with persons charged with crime. If the Bill of Rights afforded the citizen no protection against governmental action, it would be no Bill of Rights. The Court there concluded in unequivocal terms that the constitutional rights set forth in the Fifth and Sixth Amendments require that, after a person is taken into custody (and even before he is charged with a crime), "the person must be warned that he has a right to remain silent * * * and that he has a right to the presence of an attorney * * *." If the defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him."[23]

■ The scope of the right to the assistance of counsel and the privilege against self-incrimination has been extended by the decisions in *Escobedo* and *Miranda*. But the mandate of these decisions is clear: the person charged with a crime has the right to choose either to speak or not to speak, and, if he elects to remain silent, he cannot be compelled to speak, nor can his refusal be later considered against him.[24] If, as set forth in *Escobedo*, a person accused of a crime must be advised of an absolute constitutional right to remain silent in any police investigation, there is all the more reason why he should have an absolute right not to testify under oath before a grand jury in the absence of his lawyer. For testimony before the grand jury is not merely the exchange of pleasantries. The examination is conducted in secret. The

18. 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977.

19. Escobedo v. State of Illinois, 1964, 378 U.S. 478, 487, 84 S.Ct. 1758, citing Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792.

20. Black, J., dissenting In re Groban, 1957, 352 U.S. 330, 344, 77 S.Ct. 510, 1 L.Ed.2d 376.

21. 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

22. As pointed out above, this is also made applicable to the states by the Fourteenth Amendment's guarantee of due process of law. Malloy v. Hogan, 1964, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653.

23. 384 U.S. at 444, 86 S.Ct. at 1612.

24. 384 U.S. at 474, 86 S.Ct. 1602.

witness is required to testify under oath. The questions put to him can cover the entire range of the state's criminal law. That an incriminatory statement elicited from a person charged with a crime who is interrogated in the absence of his lawyer may be inadmissible [25] does not afford full protection to the constitutional privilege. For it is difficult for the witness to determine just how broad this immunity is. And it imposes a serious problem for the witness to determine at his peril whether the questions put to him are themselves innocuous, or incriminatory, or may potentially lead to the discovery of incriminating evidence. Certainly no one would elect to fence with the District Attorney and the grand jury with their own foils at the peril of a possible term in prison.

The difficulties confronting a suspect who is subjected to an in camera examination are discussed in Kamisar, "Criminal Justice in Our Time—Equal Justice in the Gatehouses and Mansions of American Criminal Procedure," 1965, pages 13 and following. As the author there points out, there is a difference between the right to remain silent and the right simply to refuse to answer any questions which may incriminate you; there is a difference between the right to tell your story in your own way and your ability to deal with trained adversaries who ask you questions; and it is difficult for the witness to deal adequately with leading questions.

Even before the decisions in *Escobedo* and *Miranda* the question arose whether a witness summoned to appear before a

grand jury could refuse to be sworn as a witness or could refuse to testify at all after being sworn on the basis of the privilege against self-incrimination. Most of the Courts that considered the question refused to recognize the privilege.[26] But several state courts took the view that, where a grand jury investigation is directed against a particular person in such a way that he is in effect himself under investigation as a criminal suspect, his constitutional privilege permits him to refuse to testify at all.[27] These cases are not directly applicable here because there is no evidence that Sheridan's grand jury testimony is being sought for the purpose of charging him with a crime, but they do indicate that some courts have recognized the unique nature of grand jury proceedings and the need for special protection of a witness who is also only a potential accused—let alone one who stands already charged with an offense.

The Louisiana courts have themselves been careful to protect the rights of a person who is the suspect in a grand jury investigation, but who is not yet charged with a crime. Thus, in State v. Harrell,[28] the Louisiana Supreme Court held that a defendant should not have been brought before a grand jury investigating the crime which he was suspected of committing from information already in its possession, in the absence of a request by him to appear, and that he should not have been interrogated concerning the crime "without being fully advised of his privilege against self-incrimination." The motion to quash was granted. The case was reaffirmed and its rule was ap-

25. Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758.

26. See Note 15 supra, and United States v. Gilboy, M.D.Penn.1958, 160 F.Supp. 442; United States v. Manno, N.D.Ill. 1954, 118 F.Supp. 511.

27. People v. Steuding, 1959, 6 N.Y.2d 214, 189 N.Y.S.2d 166, 160 N.E.2d 468; Commonwealth v. Gross, 1952, 172 Pa. Super. 85, 92 A.2d 251; In re Manko, 1950, 168 Pa.Super. 177, 77 A.2d 700; People v. Seaman, 1940, 174 Misc. 792,

21 N.Y.S.2d 917; People v. Bermel, 1911, 71 Misc. 356, 128 N.Y.S. 524. Compare Massiah v. United States, 1964, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, holding that a petitioner was denied the right to counsel when, after he had been indicted, federal agents obtained incriminating statements from him in the absence of counsel through a co-defendant who engaged petitioner in a conversation in the presence of a hidden radio transmitter.

28. 1955, 228 La. 434, 82 So.2d 701.

plied by the Louisiana Supreme Court in State v. Jemison.[29]

There is little authority directly applicable to the situation where the witness is already charged with an offense and an attempt is made to compel him to appear before a grand jury. However, ten years ago, the Supreme Court held In re Groban [30] that witnesses called to testify at a proceeding called by a state fire marshal to investigate the cause of a fire do not have a constitutional right to counsel. Justice Black, and three other justices, dissented from this opinion stating:

"I believe that it violates the protections guaranteed every person by the Due Process Clause of the Fourteenth Amendment for a state to compel a person to appear alone before any law-enforcement officer and give testimony in secret against his will. Under the reasoning of the majority every state and federal law-enforcement officer in this country could constitutionally be given power to conduct such secret compulsory examinations." [31]

In Piemonte v. United States,[32] a person who had been convicted of a crime and who was serving a prison sentence had been held in contempt for refusal to testify before a grand jury under a grant of immunity from "prosecution which might arise from any answers that you give this Grand Jury concerning the matter of this investigation," an immunity far broader than any the District Attorney or the state court can afford Sheridan here. The sentence was affirmed. It will be noted that neither the question of right to the assistance of counsel nor the privilege against self-incrimination was raised. However, the witness who refused to testify was later indicted by the grand jury; still later, while his

case was on appeal, the indictment was dismissed. Even under these circumstances, Mr. Justice Douglas, who was joined by Mr. Justice Black, observed in dissenting:

"There is no power in our free society to compel a person to talk about a matter on which he has been indicted or to penalize him for failure to do so. We might as well say that an accused can be committed for contempt for failure to take the stand at his own trial." [33]

In Jones v. United States,[34] decided after *Escobedo* and before *Miranda*, the Court of Appeals for the District of Columbia held that there was no violation of the privilege against self-incrimination or of the right to assistance of counsel in the use of the testimony of a witness taken before a grand jury where the witness was advised four times before he spoke to the grand jury that he need not speak. The Court said, " * * * [T]he most a lawyer could have done would have been to advise him that he need not speak."

In that case, the majority relied upon United States v. Cleary [35] in which the court held that testimony given before a grand jury by a witness under arrest who had been warned of his rights could constitutionally be used against him. But it went on to say that the warnings given the witness in the *Jones* case that he need not speak ("You don't have to tell us anything"), the evidence that the witness himself wanted to go before the grand jury and the fact that nothing the witness said was later used at the trial "put the matter beyond the realm of dispute."

Notwithstanding these facts, Judge Edgerton dissented and Judges Bazelon, Fahy and Wright joined him. Some of

**29.** 1960, 240 La. 787, 125 So.2d 363. See also State v. Smalling, 1960, 240 La. 915, 125 So.2d 409, in accord.

**30.** 1957, 352 U.S. 330, 77 S.Ct. 510.

**31.** 352 U.S. at 337, 77 S.Ct. at 515.

**32.** 1961, 367 U.S. 556, 81 S.Ct. 1720, 6 L.Ed.2d 1028.

**33.** 367 U.S. at 566, 81 S.Ct. at 1726.

**34.** 1964, 119 U.S.App.D.C. 284, 342 F.2d 863.

**35.** 2d Cir., 1959, 265 F.2d 459, cert. denied 360 U.S. 936, 79 S.Ct. 1458, 3 L.Ed. 2d 1548.

Judge Edgerton's comments are particularly appropriate where, as here, the witness does not want to say anything and does not want to appear:

> " 'No doubt it would be a boon to prosecutors if they could summon before a Grand Jury a person against whom an indictment is being sought and there interrogate him, isolated from the protection of counsel and presiding judge and insulated from the critical observation of the public. But there is a serious question whether our jurisprudence, fortified by constitutional declaration, permits that procedure.' Powell v. United States, 96 U.S.App. D.C. 367, 372, 226 F.2d 269, 274. We think this question should be answered in the negative. We cannot reconcile that procedure, which was used in this case, with the Fifth Amendment guarantee that 'No person shall be compelled in any criminal case to be a witness against himself.'

> "Like a trial, a grand jury investigation of a crime is 'a criminal case' at which incriminating questions need not be answered. Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). At a trial, putting the accused on the witness stand without his consent and asking him anything at all would violate his constitutional privilege against self-incrimination. We think taking him before the grand jury without his consent and asking him anything violates his privilege." [36]

> \*　　\*　　\*　　\*　　\*　　\*

> "Mere interrogation before a grand jury may harm the accused as much as mere interrogation at a trial. Even if he makes 'no direct incriminating statement, there is no way to know whether in fact his appearance was incriminating in the minds of some or all the members of the Grand jury.' United States v. DiGrazia, 213 F.

Supp. 232, 234 (N.D.Ill.1963). His having been brought there may arouse suspicion. His manner and voice may arouse suspicion. Because grand jury investigations are secret, as we said in *Powell* he is 'isolated from the protection of counsel and presiding judge and insulated from the critical observation of the public.' Though he may be unqualified \* \* \* to decide for himself what questions to answer, he must decide at his peril. If he answers incriminating questions he may make it certain \* \* \* that he will be indicted. And testimony before the grand jury may be used \* \* \* to impeach his testimony at trial. If he refuses to testify at all, or to answer some questions on the ground that answers might incriminate him, the grand jury may draw conclusions. If he refuses to answer questions that are not incriminating, he may be guilty of contempt." [37]

The later decision of the Second Circuit Court of Appeals in United States v. Pappadio [38] refuses to recognize a right not to testify before a grand jury on the part of a witness under indictment where the Court had already issued an order granting him immunity from prosecution with respect to the testimony that would be elicited before the grand jury. But the Court relied in large measure upon the fact that the witness had been granted this broad immunity.

In United Staes v. Scully,[39] the Court of Appeals for the Second Circuit held that " \* \* \* [T]he principle which underlies the rule that the defendant in a criminal trial may refrain even from being sworn as a witness, has no application to proceedings before a Grand Jury." The distinction between eliciting testimony before a formal charge is openly made and after it has been made "may be artificial and unsound." However, "If, as and when the question, whether the bundle of rights in the Fifth Amend-

---

36. 342 F.2d at 867.

37. 342 F.2d at 868.

38. 1965, 346 F.2d 5, vacated on other grounds, Shillitani v. United States, 1965, 384 U.S. 364, 86 S.Ct. 1531.

39. 2 Cir., 1955, 225 F.2d 113.

ment includes that of a defendant, already charged * * * to a warning when subsequently called to testify before a Grand Jury, is squarely before us, it seems not unlikely that reasons other than the distinction between parties and mere witnesses, above referred to, may convince us that, under certain circumstances or absolutely, a warning is required. We do not now say that it is not, but only that this court has not ruled on the point."

The court went on to say that " * * * a prudent prosecutor, to forestall the possibility of error, will in such cases give a warning. Indeed, one would suppose that, as a matter of ethics or fair play or policy, a prosecutor would in all cases refrain from calling as a witness before a Grand Jury any person who is *de jure* or *de facto* an accused. The absence of appeals to this court involving the problem under discussion would seem to indicate that some such rule of practice is observed in the prosecutors' offices in this circuit."

The defendant has cited a number of cases in support of the right to subpoena Sheridan. Some of these cases have been discussed above. None of the rest of them deal squarely with the point here at issue. Thus, for example, in United States v. Kane,[40] a witness subpoenaed to testify before the grand jury was advised that he was a possible defendant and of his privilege against self-incrimination. He insisted he had a right to have his lawyer present in the grand jury room, and, when this right was denied, he refused to testify at all. He was indicted later the same day, but no effort was made to require him to testify. Under these circumstances, the court refused to dismiss the indictment against him. It did of course say, in dictum, that: "The facts relied upon do not amount to a deprivation of defendant's Sixth Amendment right to the effective assistance of counsel" because "[H]e had no right to have counsel present with him in the grand jury room," but it was not directly confronted with an effort to punish the defendant for refusing to appear without counsel. The Court observed that "Whatever the radiations in Escebedo v. Illinois, this Court finds no warrant at this time to pronounce the demise of the tradition, enforced by the Federal Rules, that the grand jury testimony is taken in the absence of the witness' attorney." But the question was whether the indictment was defective, not whether the witness—or a defendant already charged with a crime—could be compelled to appear.

Similarly, in United States v. Winter,[41] the court held that the Fifth Amendment did not prohibit "the Government from ever summoning before a grand jury one who has become a target of inquiry and is a 'potential' defendant," adding significantly here, "Repeatedly this Court has so ruled, declining to equate the position of a 'potential' defendant called before a grand jury with that of one already on trial."[42] And in United States v. Leighton,[43] the Court held that the defendant's Fifth and Sixth Amendment rights were not violated when a "potential" defendant was examined before a grand jury, relying upon *Winter*, and upon the fact that his counsel accompanied the witness to the grand jury room, was present in a closely adjacent area while the witness was testifying and the witness was "specifically advised in the grand jury room that the Grand Jury might vote an indictment against him, that he had a right to refuse to answer any questions which might incriminate him and that he had the right to leave the grand jury room to consult with his lawyer when he thought it necessary."[44]

Nor is Cardarella v. United States[45] applicable here because, like some of the

---

40. S.D.N.Y.1965, 243 F.Supp. 746.

41. 2 Cir., 1965, 348 F.2d 204, cert. denied 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360.

42. Id. at 207.

43. S.D.N.Y.1967, 265 F.Supp. 27.

44. Id. at 38.

45. 8 Cir., 1967, 375 F.2d 222.

cases already discussed, it holds merely that the self-incrimination clause of the Fifth Amendment does not immunize one who is neither in custody nor charged with an offense from being summoned to testify before a grand jury merely because an indictment may result from his testimony.

As thus appears, federal courts, even prior to the *Escobedo* decision, expressed concern about the propriety of the District Attorney's calling before a grand jury as a witness a person who was the subject of an investigation but had not yet been charged formally with an offense. There seems to have been little effort by other prosecuting attorneys to call persons already charged with crimes to appear before grand juries but there is undoubtedly greater doubt about the constitutional propriety of such action. The decisions in the *Escobedo* and *Miranda* cases announce in forceful terms the right of a person charged with a crime to the presence of his counsel at any time that he is questioned and his right to speak or to remain silent at any time that he is questioned.

At least two commentators have concluded that the "logic of *Escobedo* would seem to require application of its safeguards to grand jury" proceedings.[46] This conclusion appears inescapable.[47]

Sheridan has made every effort to raise these issues in state court. He has filed a motion to quash the subpoena in state court, and, when it was denied, he filed an application for writs with the Louisiana Supreme Court in which he raised all of the issues now before this court. The Louisiana Supreme Court denied the application for writs, refusing to grant relief "at this time."

The District Attorney contends however that "no information which might be obtained by the Grand Jury from Sheridan during his appearance could in any way be used against him during his later trial for public bribery." In this connection, he relies upon Art. XIX, Section 13, of the Louisiana Constitution which provides:

"Any person may be compelled to testify in any lawful proceeding against any one who may be charged with having committed the offense of bribery and shall not be permitted to withhold his testimony upon the ground that it may incriminate him or subject him to public infamy; but such testimony shall not afterwards be used against him in any judicial proceedings, except for perjury in giving such testimony."

The Louisiana Supreme Court has held that the immunity granted by this provision shields a person who is called to testify before a grand jury and who is later indicted. State v. Smalling.[48] It has not yet been decided by the Louisiana courts whether this guarantee applies with equal force to one who is not merely a prospective accused (that is "one who *may* be charged"), but who is already formally charged with public bribery.

But beyond this the Louisiana constitutional provision by its very language protects only a witness "compelled to testify in any lawful proceeding against anyone who may be charged with having committed the offense of bribery." The subpoena to Sheridan does not specify

46. The Supreme Court, 1963 Term, 1964, 78 Harvard Law Review 143, 222–23; Meshbesher, Right to Counsel before Grand Jury, 41 F.R.D. 189.

47. In People v. Ianiello, N.Y.Sup.Ct., 35 U.S. Law Week 2003, the court held that the Sixth Amendment barred a criminal contempt indictment based on testimony a witness was compelled to give before a grand jury after he had been denied access to his counsel who was outside the grand jury room. The holding was expressly predicated on the refusal to allow the witness to speak to his counsel *outside* the grand jury room to ascertain his rights. But see dicta in Directory Services, Inc. v. United States, 8 Cir., 1965, 353 F.2d 299, in which Escobedo was not cited and which was decided before Miranda.

48. 1960, 240 La. 915, 125 So.2d 409. See also State v. Rodrigues, 1951, 219 La. 217, 52 So.2d 756; State v. Dominguez, 1955, 228 La. 284, 82 So.2d 12; and State v. Ford, 1957, 233 La. 992, 99 So. 2d 320.

what offense the Orleans Parish Grand Jury is investigating nor what path the questions put to him may take. Suppose the grand jury wishes to interrogate Sheridan about the alleged plot to assassinate President Kennedy. His testimony would not then grant him immunity from prosecution for bribery. Yet for the reasons discussed by Judge Edgerton in his dissent in the *Jones* case, such testimony might be used to his detriment in the bribery proceedings pending against him.

The District Attorney suggests that Sheridan's lawyer may wait outside the grand jury room and that Sheridan may call on his counsel from time to time if he sees the need. But there is no way for Sheridan or his lawyer to know whether the grand jury investigation is against public bribery and hence is no threat to Sheridan or is against some other offense, leaving Sheridan naked to those whom he conceives to be his enemies. Nor can Sheridan be certain at this stage that all of the evidence that might be discovered indirectly as a result of his testimony would be inadmissible against him as "fruit of a poisoned tree." [49]

Finally the District Attorney states in his brief that:

"Sheridan will be told when he appears before the Grand Jury for the Parish of Orleans 1) that he must answer any question relating to public bribery because the State of Louisiana will not be able to use anything it learns from him in this area against him, see Art. 19, Sec. 13, of the Louisiana Constitution; and 2) that he need not answer any question not relating to public bribery if he feels that his answer will incriminate him in any way, see Art. 1, Sec. 11, La.Const. Sheridan is represented by able counsel who know that he has been summoned to appear before the .Grand Jury, and who can advise him in advance and wait outside the Grand Jury room *to advise him further if he is questioned by the Judge on behalf of the Grand Jury in open court.*" (Emphasis supplied.)

The problem here is that Sheridan will be forced outside the presence of counsel to match legal wits with the District Attorney. Charged as a criminal, he will sit before a grand jury, forced to undergo interrogation outside the presence of his lawyer, required to decide at his peril and without the benefit of counsel present at the time whether any particular question relates to public bribery or does not relate to public bribery and, if it does not, whether his answer may incriminate him in any way. This is a far cry from the right to speak or remain silent and the right to the assistance of counsel recognized in *Escobedo* and spelled out in detail in *Miranda*. In this court's opinion it's not enough.

■■ Louisiana's courts are charged with the responsibility not only for the application of Louisiana law but also with the protection of Louisiana citizens and their rights under both the Louisiana Constitution [50] and the Constitution of the United States. This court has full confidence that Louisiana's courts and its judges act with full regard for their responsibilities—indeed with at least as high a standard of honor and duty as this court itself. However, at this moment, Sheridan is faced with the necessity either of appearing in state court to face a charge of contempt of court or with the necessity of complying with a subpoena which he has made every effort to resist in state court. Under these circumstances, and in view of this court's opinion that Sheridan's federal constitutional rights

---

49. See State v. Callahan, 1965, 247 La. 525, 172 So.2d 668, quashing an indictment based only in part on testimony before it. Compare the "fruit of the poisoned tree" doctrine. Nardone v. United States, 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307.

50. La. Constitution of 1921, Art. 1, § 9 provides in part, "The accused in every instance shall have the right * * * to have assistance of counsel * * *."; Art. 1, § 11 provides in part, "No person shall be compelled to give evidence against himself in a criminal case * * *."

are abridged by the threat to punish him for contempt, summary judgment in his favor is granted to the extent that a preliminary injunction against enforcement of the subpoena issued on July 18, 1967, will be granted and the permanent injunction prayed for with respect to that subpoena will likewise be granted. Counsel for Sheridan will prepare a proposed injunction and submit it to opposing counsel and the court for review.

## INJUNCTION AGAINST PROSECUTION

Sheridan and Townley next seek to enjoin their prosecution under the state charges pending against each of them. They base their claim to federal jurisdiction on the provisions of 28 U.S.C. § 1343(3), (4)[51] conferring jurisdiction on the federal courts to hear actions brought under the Civil Rights Act of 1871.[52]

The adoption of the Constitution of the United States did not long precede the first conflict between the exercise of jurisdiction by federal and state courts. On March 2, 1793, only four years after the Constitution went into effect, and long before the Capitol was moved from Philadelphia to Washington, Congress enacted a statute forbidding federal courts to grant injunctions staying proceedings in state courts. "The history of this provision in the Judiciary Act of 1793 is not fully known."[53] There is no record of any Congressional debate.[54] It has been suggested that the original purpose of the statute was to prevent federal equity courts from interfering with judg-

ments rendered at law in the state courts,[55] or that the provision reflected strong feeling against the unwarranted intrusion of federal courts in state sovereignty,[56] or that it reflected the "prevailing prejudices against equity jurisdiction."[57]

Whatever its origin, the broad basic rule against the use of injunctions to restrain proceedings in state courts remained in force, although exceptions to it were developed by judicial decision,[58] and the statute was amended from time to time. As last revised on June 25, 1948, it forms 28 U.S.C. § 2283, and provides:

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

The statute is still refreshingly brief and clear. Even he who runs may read its direct mandate.

But Sheridan and Townley argue that it does not prohibit the issuance of an injunction here because their suit is expressly authorized by Act of Congress by virtue of the Civil Rights Act of 1871 which affords an injured party redress against any person who, "under color of any statute, ordinance, regulation, custom or usage of any State," attempts to deprive him of his civil rights. In addition, they say that Section 2283 establishes only a rule of comity and judicial discretion which must yield when neces-

---

51. Note 2, supra.

52. 42 U.S.C.A. § 1983.

53. Toucey v. New York Life Insurance Co., 1941, 314 U.S. 118, 130, 62 S.Ct. 139, 86 L.Ed. 100. The history of the evolution of the statute is traced in Baines v. City of Danville, 4th Cir., 1964, 337 F.2d 579. See also Comment (1961), "Federal Power to Enjoin State Court Proceedings," 74 Harv.L.Rev. 726.

54. Ibid.

55. See Report of Attorney General Edmund Randolph, Dec. 31, 1790, on desirable changes in the Judiciary Act of

1789, Am. State Papers, Misc., Vol. 1, No. 17, pp. 21–36, and Warren, "Federal and State Court Interference," 1930, 43 Harv.L.Rev. 345, 347. A discussion of the development of the jurisprudence prior to the 1948 Amendment is found in Taylor & Willis, "The Power of Federal Courts to Enjoin Proceedings in State Courts," 1933, 42 Yale L.J. 1169.

56. Toucey v. New York Life Insurance Co., 1941, 314 U.S. 118, 131, 62 S.Ct. 139.

57. Ibid.

58. Ibid.

sary to preserve constitutional rights. They rely primarily upon the United States Supreme Court decision in Dombrowski v. Pfister.[59]

If Section 1983 authorizes the issuance of an injunction, it does not do so in *haec verba*. This result must be gleaned from its provision giving the "party injured * * * an action at law, suit in equity, or other proper proceeding for redress."

Whatever may be the scope of the decision in *Dombrowski*, it does not decide the issue here; and the Supreme Court expressly said as much in that opinion. In footnote 2 to the Court's opinion, it said:

> "We therefore find it unnecessary to resolve the question whether suits under 42 U.S.C. § 1983 (1958 ed.) come under the 'expressly authorized' exception to § 2283. Compare Cooper v. Hutchinson, 184 F.2d 119, 124 (C.A. 3d Cir. 1950), with Smith v. Village of Lansing, 241 F.2d 856, 859 (C.A. 7th Cir. 1957). See Note, 74 Harv.L. Rev. 726, 738 (1961)."

A number of federal courts have faced the question, however, and have reached opposite conclusions with apparent equal facility.[60] Some find in the Civil Rights Act of 1871 an express exception to the rule forbidding injunctions to stay state court proceedings.[61] Others see in it no alteration of the basic anti-injunction policy.[62]

Until either the Supreme Court or the Fifth Circuit Court of Appeals determines the present scope of Section 2283, there is no authoritative precedent for this court. But whether injunctive relief is forbidden by that Section is only the first question raised here; the next question is whether, even if that section does not bar the door, and if the court has discretion to grant an injunction, it should do so under the circumstances of this case.

Let us then first consider the basic policy behind the statute. In 1941 the United States Supreme Court said in Toucey v. New York Life Insurance Co.:

> "Regardless of the various influences which shaped the enactment * * * the purpose and direction underlying

**59.** 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22.

**60.** See authorities cited in Studebaker Corporation v. Gittlin, 2 Cir., 1966, 360 F.2d 692; Baines v. City of Danville, 4th Cir., 1964, 337 F.2d 579, cert. denied sub nom. Chase v. McCain, 1965, 381 U.S. 939, 85 S.Ct. 1772, 14 L.Ed.2d 702; Note, "Developments in the Law —Injunctions," 78 Harv.L.Rev. 994, 1051 (1965). See also Comment: Anticipatory Relief in Federal Courts Against State Criminal Prosecutions Growing Out of Civil Rights Activities, 1966, 8 A.L.R. 3rd 301, 316.

**61.** Cooper v. Hutchinson, 3 Cir., 1950, 184 F.2d 119; Tribune Review Publishing Co. v. Thomas, D.C.Pa., 1957, 153 F. Supp. 486, aff'd 3 Cir., 1958, 254 F.2d 883. An express authorization for injunctive relief within the meaning of Section 2283 has been held contained in the Civil Rights Act of 1964 [42 U.S.C.A. § 2000a–3(a)]. Dilworth v. Riner, 5th Cir., 1965, 343 F.2d 226.

**62.** Sexton v. Barry, 6 Cir., 1956, 233 F.2d 220, cert. denied 352 U.S. 870, 77 S.Ct. 94, 1 L.Ed.2d 76; Smith v. Vil-

lage of Lansing, 7 Cir., 1957, 241 F. 2d 856; Baines v. City of Danville, 4 Cir., 1964, 337 F.2d 579, cert. denied, Chase v. McCain, 381 U.S. 939, 85 S.Ct. 1772. Cameron v. Johnson, S.D.Miss., 1966, 262 F.Supp. 873. In People of State of Michigan v. Barnard, D.C.Mich., 1965, 239 F.Supp. 306, injunctive relief was denied on the basis, in part, that "there is no reason to believe that the atmosphere in Ann Arbor is so prejudicial to petitioners that the State court will not protect their rights." And in Zellner v. Lingo, M.D.Ala., 1963, 218 F. Supp. 513, aff'd 334 F.2d 620, the court refused to enjoin a prosecution in state court although it stated that this was not to be "construed as an approval" of the action taken by the state officers and that "[t]his Court is not unmindful of the consistent action of the Supreme Court of the United States in reversing such convictions * * *. It is significant to note, however, that in each of these cases the matter was presented to the Supreme Court through the state court system not in a collateral proceeding in a United States district court * * *."

the provision is manifest from its terms: proceedings in the state courts should be free from interference by federal injunction. The provision expresses on its face the duty of 'hands off' by the federal courts in the use of the injunction to stay litigation in a state court."

Later in the same case the Supreme Court described the design of the act:

"The Act of 1793 expresses the desire of Congress to avoid friction between the federal government and the states resulting from the intrusion of federal authority into the orderly functioning of a state's judicial process."

The majority opinion in *Dombrowski* said:

" * * * [T]he Court has recognized that federal interference with a State's good faith administration of its criminal laws is peculiarly inconsistent with our federal framework. It is generally to be assumed that state courts and prosecutors will observe constitutional limitations as expounded by this Court, and that the mere possibility of erroneous initial application of constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings." [63]

Similarly, the Court said in Stefanelli v. Minard:[64]

"For even if the power to grant the relief here sought may fairly and constitutionally be derived from the generality of language of the Civil Rights Act, to sustain the claim would disregard the power of courts of equity to exercise discretion when, in a matter of equity jurisdiction, the balance is against the wisdom of using their power. Here the considerations governing that discretion touch perhaps the most sensitive source of friction between States and Nation, namely, the active intrusion of the federal courts in the administration of the criminal law

for the prosecution of crimes solely within the power of the States." [65]

It would serve no useful purpose to attempt to analyze in detail the various recent federal opinions which have explored the reach of the Civil Rights Act of 1871 with respect to whether it constitutes an express exception to the anti-injunction policy. The question was recently considered, and thoroughly discussed, in Cameron v. Johnson.[66] In that case, a three-judge district court, composed of Circuit Judges Coleman and Rives and District Judge Cox, was appointed to consider a declaratory judgment declaring a Mississippi statute unconstitutional and an injunction against prosecution of the plaintiffs. The court held Section 2283 applicable because, in its opinion, the Civil Rights Act of 1871 does not create an exception to the anti-injunction statute. Judge Rives dissented on the basis that the Act is an express exception to the terms of Section 2283.

In his dissent Judge Rives stated that Section 2283 "is aimed primarily at allowing state courts to proceed to the determination of issues involving state law which might be drawn to the federal courts," although this does not appear to have been the original purpose of the statute as it was analyzed in the *Toucey* case or in the other studies of its historical background. In his opinion, the court was being asked to vindicate primarily federal rights protected by a specific federal statute on the basis of an allegation that the purpose of the arrest and prosecution which had already begun under the state law "is to harass and punish the plaintiffs for their participation in the civil rights movement and to deter them, and others similarly situated, from exercising rights of free speech and assembly guaranteed by the Federal Constitution and the right to urge or aid others to attempt to register and vote guaranteed by federal statute. * * * Under these circumstances, section 1983

63. 380 U.S. at 484, 85 S.Ct. at 1119.

64. 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138.

65. Ibid 342 U.S. at 120, 72 S.Ct. at 120.

66. S.D.Miss., 1966, 262 F.Supp. 873.

is and should be an express exception to section 2283. * * * "

Judge Fred J. Cassibry of this Court recently had occasion to consider a similar problem in Brock v. Schiro,[67] where an injunction was sought against prosecution of the plaintiffs who were arrested in Jackson Square for violating a New Orleans Municipal Ordinance. There, as here, the plaintiffs alleged violation of their rights of free speech and other constitutional rights. After a careful review of the controlling authorities Judge Cassibry concluded that, "The Civil Rights Act therefore affords plaintiffs no relief." Indeed, a careful analysis of the cases cited by the plaintiffs indicates that, even where courts have said that an injunction may issue under authority of the Civil Rights Act of 1871, in not a single case has an injunction actually been issued.

■■■ The basic legal principles applicable generally to the issuance of injunctions cannot be overlooked merely because the plaintiffs contend that the defendant's prosecution of the charges against them violates their constitutional rights. I recently set forth a summary of these principles in connection with another sort of case in Standard Brands, Inc. v. Zumpe [68] as follows:

"It is hornbook law that injunctive relief is an unusual remedy, available only in those instances in which the rights of the parties cannot be otherwise adequately protected. The issuance of an injunction is not justified by the mere fact that irreparable harm may possibly ensue if restraint is not imposed. The plaintiff must make out a case for the issuance of the injunction by demonstrating that there is a clear present need for it. Injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties. Nor will an injunction be issued 'to restrain one

from doing what he is not attempting and does not intend to do.' " [69]

This case is not, as in Dombrowski, "A criminal prosecution under a statute regulating expression." [70] Nor is this a case of mass arrests of the kind involved in Cameron.[71] Nor is there the appeal to the Chancellor's conscience that would be present in this suit for an injunction if the plaintiffs were confined to jail or threatened with imprisonment during a long struggle to vindicate their rights in state courts.

■■■ The criminal charges against Sheridan and Townley are, at least on their face, unrelated to the plaintiffs' exercise of their civil rights. The constitutionality of the statute, under which they are charged has not been drawn into question, although plaintiffs' counsel asserts that he may yet amend his complaint to do so. Six affidavits have been filed in an apparent effort to support the allegations of the complaint that the threatened prosecution has a "chilling effect" on plaintiffs' exercise of their right to freedom of speech and, for purposes of this opinion, the court will assume that this is correct. But in none of the affidavits is it stated that other criminal prosecutions against either of the plaintiffs have been threatened or that other criminal charges against television reporters, radio broadcasters, newspaper reporters or other instrumentalities of the press have been commenced or are threatened. Read most favorably to the plaintiffs, these affidavits indicate only that the District Attorney has subpoenaed and by use of subpoenas has attempted to intimidate many of those who executed affidavits, that he has used intemperate language, that he has said he will "get" Sheridan, that he has attempted to have plaintiffs beaten, and that he has not prosecuted others for public bribery when convincing evidence against them was presented to him because they

67. E.D.La., 1967, 264 F.Supp. 330.

68. E.D.La., 1967, 264 F.Supp. 254.

69. Ibid at 267. Authorities are cited therein at length.

70. 380 U.S. at 486, 85 S.Ct. at 1120.

71. Note 66, supra.

were presumably favorable to him or at least not critical of him. These are of course serious charges and the allegations are sufficient to justify a hearing on the plaintiffs' prayer for injunctive relief against other action to harass, to intimidate, or to interfere with their constitutional rights. But the complaint does not claim more than has been stated nor would all of the facts set forth in the affidavits prove more than the "chilling effect" on free speech alleged in the complaint.

The investigations by the District Attorney into the possibility that there was a plot to assassinate the late president has attracted world-wide attention. It is an investigation by the State into a matter of great significance and there may be at stake the liberty of persons accused of crime, the careers of public officers involved in the investigation, and the integrity of federal agencies. The investigation has not been completed, and the prosecutions commenced as a result of it have not yet come to trial. The charge of bribing witnesses who have testified before the Orleans Parish Grand Jury during the course of the investigation is a charge of an attempt at a serious obstruction of justice. These facts too must be taken into account in determining whether this Court should exercise its discretion to issue an injunction even if its hand is not peremptorily stayed by the anti-injunction statute.

It is of course alleged that the charges against plaintiffs are "totally lacking in substance." Also, it is alleged "that the charges were filed not for legitimate purposes of good faith prosecution but rather in furtherance of defendant's scheme of harassment and intimidation of the plaintiffs."

These allegations require in essence the presentation in advance of trial in state court of the very evidence on which the criminal charges are based. If the plaintiffs' charges are not supported, such a trial would be tantamount to a discovery proceeding in federal court relative to the evidence on a state criminal charge. And if such a hearing could be granted merely on the allegation here made, then virtually every defendant accused of a state crime might have a go at the game. The extent to which habeas corpus procedures are now used to assert federal constitutional rights after state convictions gives at least some hint of the number of injunction suits that might be instituted before trial, especially if, apart from the chances of success at getting an injunction, this provided a way to see a few of the State's hole cards.

The State of Louisiana has provided a procedure whereby any person charged with a crime may seek to have a preliminary examination. This procedure, as set forth in the Louisiana Code of Criminal Procedure, Articles 291 et seq., was provided, state authority tells us, as "important protection against high-handed police procedures and third degree methods. It provides an opportunity to bring defense counsel into the picture —implementing the constitutional privilege against self-incrimination, and the right to bail. Other legal rights come into play, thus placing a check on the risk of 'official lawlessness' during pre-trial investigations." [72]

When a preliminary examination is ordered, the court must conduct the examination promptly.[73] If the defendant has not been indicted by a grand jury for the offense charged, the court must order his release from custody or bail if, from the evidence adduced, it appears that there is not probable cause to charge him with the offense or with a lesser included offense. While State courts are given discretion in determining whether or not to conduct such a hearing when it is first sought after the information has been filed, it would

---

72. See preliminary statement of the redactors of the Louisiana Code of Criminal Procedure, Title 7, Preliminary Examination, Louisiana Code of Criminal Procedure.

73. Louisiana Code of Criminal Procedure, Article 293.

appear that in this sort of case, State courts would be likely to grant the hearing if it is sought.

Since neither of the plaintiffs has been indicted by a grand jury, such a hearing would result in discharge if the State court found there is not probable cause for their prosecution.

This, then, under all the circumstances, is not a case in which "irreparable injury, clear and imminent, is threatened." [74] It is rather a case in which the caution of the Supreme Court in the *Steffanelli* case seems particularly apt:

> "Only last term we reiterated our conviction that the Civil Rights Act 'was not to be used to centralize power so as to upset the federal system.' Collins v. Hardyman, 341 U.S. 651, 658, 71 S.Ct. 937, 940, 95 L.Ed. 1253. Discretionary refusal to exercise equitable power under the Act to interfere with State criminal prosecution is one of the devices we have sanctioned for preserving this balance. Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324. And under the very section now invoked, we have withheld relief in equity even when recognizing that comparable facts would create a cause of action for damages. Compare Giles v. Harris, 189 U.S. 475, 23 S.Ct. 639, 47 L.Ed. 909, with Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed 1281." [75]

There are surely no foundation stones on which our republic is built more essential to its preservation than the rights to freedom of speech and to freedom of the press. But these rights are not always best preserved in a federal system by rapid applications of a soothing compress of injunctive relief. As the Supreme Court has observed, Mr. Justice Holmes "dealt with the problem in a situation especially appealing: 'The

relation of the United States and the Courts of the United States to the States and the Courts of the States is a very delicate matter that has occupied the thoughts of statesmen and judges for a hundred years and can not be disposed of by a summary statement that justice requires me to cut red tape and to intervene.' Memorandum of Mr. Justice Holmes in 5 The Sacco-Vanzetti Case, Transcript of the Record (Henry Holt & Co., 1929) 5516." [76]

The rights which the plaintiffs seek to vindicate are federal rights—rights which this court sits to protect. But there are other ways to protect the First Amendment than by enjoining interference with it. Appeals from conviction, habeas corpus applications, and suits for damages are all time-tested swords with which federal courts protect federal constitutional and statutory rights. Government by injunction, long ago abandoned in the federal system as a means of resolving labor controversy, should not spring up again in the area of inter-governmental relationships.

Counsel for the plaintiffs have relied in part on what is admittedly dictum in an opinion of the Fifth Circuit Court of Appeals in Cox v. State of Louisiana.[77] In a prior proceeding against Cox for obstructing justice, it had been found by the United States Supreme Court that police and city officers were guilty of "an indefensible sort of entrapment." [78] Cox was later charged, on the basis of the "identical conduct that in 1961 led to [his] arrest and conviction" with "*attempting* to obstruct justice." The Court of Appeals held he could remove the criminal case to federal court, saying:

> "In the teeth of this holding, the district attorney is renewing the charges against Cox. The State now seeks to

---

74. Stefanelli v. Minard, 1951, 342 U.S. 117, 122, 72 S.Ct. 118, 121, 96 L.Ed. 138.

75. Ibid at 121–122, 72 S.Ct. at 121.

76. Quoted in Stefanelli v. Minard, at page 124, 72 S.Ct. at page 122.

77. This is the case sometimes called Cox II, 5 Cir., 1965, 348 F.2d 750.

78. Cox v. State of Louisiana, 1965, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487.

prosecute the petitioner for the alleged crime of *'attempting'* to do what the Supreme Court, *on the merits,* decided was not a violation of the law.

"The second prosecution is without any hope of success. The district attorney's transparent purpose is to harass and punish the petitioner for his leadership in the civil rights movement, and to deter him and others from exercising rights of free speech and assembly in Louisiana—in this instance, by advocating integration of public accommodations.

"*A civil complaint asserting such an abuse of the prosecutorial function would state a claim under the Civil Rights Act, 42 U.S.C. § 1983 and justify injunctive relief.* Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22. This is not a Douglas v. City of Jeannette, Stefanelli, or Cleary v. Bolger, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390 situation. Here the State, through the parish district attorney, under the guise of protecting the administration of justice, is challenging the Nation on a national policy expressed in the Constitution, carried out by Congress, and validated by the Supreme Court." (Emphasis supplied.)

The italicized language, citing Dombrowski is what is seized upon by plaintiffs. But the circumstances relied upon by the Fifth Circuit in that case are not even alleged here. It is not claimed here (as it was found there) that the District Attorney is "challenging the Nation" nor can it be said that there is any "transparent purpose" on his part to "harass and punish" the plaintiffs. And that case involved, not an injunction against state proceedings, but removal to federal court. Section 2283 was neither cited nor discussed, and the extreme circumstances present there are not involved here. And since the Supreme Court in City of Greenwood v. Peacock [79] has held, contrary to *Cox,* that removal of such prosecutions to federal court is *not* permitted, it is difficult to justify any extension of its obiter dictum beyond the aggravated situation presented in it, if indeed the Court would hold that it in fact extends that far after considering Section 2283.

In City of Greenwood v. Peacock, [80] only a little more than a year ago the United States Supreme Court held that a criminal prosecution could not be removed from state court to federal court even where it was alleged that the prosecution was for the "sole purpose and effect of harassing Petitioners and of punishing them for and deterring them from the exercise of their constitutionally protected" rights. What it said in reaching that decision is equally applicable here:

"Under § 1443(1), the vindication of the defendant's federal rights is left to the state courts except in the rare situations where it can be clearly predicted by reason of the operation of a pervasive and explicit state or federal law that those rights will inevitably be denied by the very act of bringing the defendant to trial in the state court."

For, as the Supreme Court there said, "[T]here are many other remedies available in the federal courts to redress the wrongs claimed by the individual petitioners * * *." The court noted that "under some circumstances" an injunction could be obtained, citing the *Dombrowski case.* But it said:

"If they go to trial and there is a complete absence of evidence against them, their convictions will be set aside because of a denial of due process of law. Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct 624, 4 L.Ed.2d 654. If at their trial they are in fact denied any federal constitutional rights, and these denials go uncorrected by other courts of the State, the remedy of federal habeas corpus is freely available to them. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837. If their federal claims at trial have been denied

---

**79.** 1966, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944.

**80.** 1966, 384 U.S. 808, 86 S.Ct. 1800.

through an unfair or deficient fact-finding process, that, too, can be corrected by a federal court. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L. Ed.2d 770.

"Other sanctions, civil and criminal, are available in the federal courts against officers of a State who violate the petitioners' federal constitutional and statutory rights. Under 42 U.S.C. § 1983 (1964 ed.) the officers may be made to respond in damages not only for violations of rights conferred by federal equal civil rights laws, but for violations of other federal constitutional and statutory rights as well. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492. * * *"

The Supreme Court noted that the removal statute should not "operate to work a wholesale dislocation of the historic relationship between the state and the federal courts in the administration of the criminal law" and commented upon the fact that a contrary result would permit almost any person accused of an offense in state court to obtain a federal hearing. While "Congress, if it chose, could provide for exactly such a system," the court felt it should not do so by judicial decision. Even in the dissent written by Mr. Justice Douglas, and concurred in by the Chief Justice and two other justices, the hearing in federal court was to be on the question whether the state *court* would fairly enforce the rights of the accused, not whether he was unjustly accused at all. Here the petitioners do not even claim that the state courts will not fairly enforce their rights. They object to the prosecution as such.

 Nor is the claim of the plaintiffs that they are being denied equal protection of the laws entitled in these circumstances to defense by injunction. This contention is founded on the allegation that the District Attorney invokes the state laws in a process of selective prosecution by which he ignores offenses committed by his supporters and allies and charges with crimes of a like nature only those whom he considers his enemies or critics. Like the other constitutional issues here set forth, this charge can be raised in the state proceeding. If it is not found meritorious there, and if there is indeed evidence to support it, ultimate review can be had in federal court by way of appeal[81] or writ of habeas corpus.[82]

Considering then the purpose of Section 2283, the decisions of the courts that have considered whether the Civil Rights Act of 1871 provides an express exception to it, and the effect that the issuance of injunctions in cases like this one would have, I conclude that Section 2283 forbids issuance of an injunction here. Even if it does not, giving utmost credence to the plaintiffs' affidavits, in the circumstances surrounding the case, the necessary showing of threatened "irreparable injury, clear and imminent" has not been made, and therefore the court should exercise its discretion and refuse to issue the injunction sought.

 It has been frequently urged as a defense to suits for habeas corpus that the plaintiffs must first exhaust their remedies in State court. This defense is no longer available with respect to either a suit for habeas corpus or for an injunction when the plaintiff proceeds on the basis of the Civil Rights Act of 1964 [83] because of an express provision in that Act [84] that the district court is to exercise jurisdiction without regard to whether the aggrieved party shall have exhausted other remedies provided by law.[85] Although there is no provision of this nature in the Civil Rights Act of 1871, which forms the basis of the present suit, the doctrine of exhaustion of remedies is nonetheless not applicable

---

81. 28 U.S.C.A. § 1257.

82. 28 U.S.C.A. § 2241 et seq.

83. 42 U.S.C. § 2000a et seq.

84. 42 U.S.C. § 2000a–6.

85. Dilworth v. Riner, 5 Cir., 1965, 343 F. 2d 226; United States v. Wood, 5 Cir., 1961, 295 F.2d 772, cert. denied 369 U.S. 850, 82 S.Ct. 933, 8 L.Ed.2d 9.

even under that statute,[86] and I do not base this decision on any doctrine of exhaustion of state remedies.

For the reasons given, the defendants' motion for summary judgment on this issue will be granted. Counsel for the plaintiffs will include a provision to this effect in the order to be prepared.

86. Although the facts in these cases were presented in a different context, see McNeese v. Board of Education, 1963, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622; Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473.