David L. **CHANDLER**

v.

**Jim GARRISON et al.**

**Civ. A. No. 67–1545.**

United States District Court
E. D. Louisiana,
New Orleans Division.

March 11, 1968.

Cicero C. Sessions, Robert E. Winn, Sessions, Fishman, Rosenson, Snellings & Boisfontaine, New Orleans, La., for plaintiff.

James Alcock, Numa Bertel, Asst. Dist. Attys., Parish of Orleans, State of Louisiana, for defendants.

Before AINSWORTH, Circuit Judge, and BOYLE and COMISKEY, District Judges.

PER CURIAM:

For the past three years plaintiff has been the New Orleans, Louisiana area representative reporter for Life Magazine, which published in September 1967 articles about "organized crime" in New Orleans. Defendants are the District Attorney, Jim Garrison, his Chief Assistant, Charles R. Ward, and James O. Sanders, Foreman of the Grand Jury for the Parish of Orleans (City of New Orleans).

In January, 1967, eight months before Life Magazine published its "organized crime" stories about New Orleans, the plaintiff was first subpoenaed by the then Grand Jury. However, upon arriving at the grand jury door, he was advised that the subpoena was not for a grand jury appearance. Rather the

District Attorney's First Assistant, Charles R. Ward, wanted to question him privately in the District Attorney's office. Once in the District Attorney's office (apparently under Article 66 of Louisiana Code of Criminal Procedure, which authorizes a court, upon receiving a written motion from the district attorney, to issue a subpoena ordering a person or persons to appear before the district attorney for questioning) plaintiff was interrogated under oath without counsel. A transcript of this interrogation was made and is in the record. The subject of the interrogation was the allegation, claimed by Ward, but denied by Chandler, to have been made by Chandler that a bribe had been paid to an investigator on the District Attorney's staff some three or four years previously in connection with a prosecution then pending. Plaintiff refused to answer some questions, pleading his Fifth Amendment right against self-incrimination. On concluding the interrogation, Ward instructed Chandler to obtain counsel to advise him, from which instruction, the nature of the interrogation he had undergone and other statements which he attributed to Ward, Chandler understood that Ward might seek to prosecute him for perjury. From the evidence, it is apparent that the District Attorney's office believed that David Chandler lied in this interrogation.

The Life Magazine articles on the existence of organized crime, in which the State of Louisiana and the City of New Orleans were prominently mentioned, were published on September 1st, 8th, and 29th, 1967.

Defendant Garrison, who has been District Attorney since 1961, denied in the public press Life's charges that organized crime existed in New Orleans, that he was personally acquainted with persons identified with the Cosa Nostra, and that a lieutenant of Carlos Marcello, the alleged ruler of the Cosa Nostra in New Orleans, several times paid his bill at the Sands Hotel in Las Vegas, Nevada, and had arranged a $5,000 credit for him in the casino.

The Life articles spurred the District Attorney to initiate a Grand Jury investigation in which Garrison publicly declared that the Grand Jury would be asked to subpoena for testimony before it everyone mentioned in the articles and every relevant witness, including the Director and members of the New Orleans Metropolitan Crime Commission, a citizens group, Sandy Smith, author of the Life articles, and all reporters connected with the story.

A Grand Jury subpoena was issued for plaintiff Chandler's appearance on September 28, 1967, but was not served, apparently because Chandler was out of the city. Between that date and October 5, 1967, Chandler's attorney, Cicero Sessions, had conversations with James L. Alcock, Assistant District Attorney, wherein agreements were reached that when Chandler's appearance was next required, Sessions would be given reasonable advance notice so that his previously scheduled Federal Court trial commitments and Chandler's appearance could be both accommodated in order that Sessions might be available to accompany and advise his client. Despite the agreement, an instanter subpoena was issued on October 5, 1967 for Chandler's appearance. Service of the subpoena was attempted but failed.

On October 5, 1967, Sessions and Alcock agreed that on October 6, 1967 Sessions, after checking his docket, would call Alcock "to firm up" an arrangement for Chandler's appearance on October 12, 1967, the next regularly scheduled meeting of the Grand Jury. Sessions claimed he called Alcock on October 6th as agreed and being unable to reach Alcock, left a message requesting that Alcock return his call, which was not done. Alcock claimed not to have received the message.

Without regard to the Sessions-Alcock conversation of October 5, 1967 and the conversation agreed to be held on the 6th, a subpoena was issued and served for Chandler's appearance on October 11, 1967, apparently because October 12th, Columbus Day, was a holiday.

Chandler, with his attorney Sessions, appeared in the District Attorney's office on the morning of October 11th before the return hour of the subpoena. After conversation with Alcock, Sessions instituted proceedings in the Criminal District Court for the Parish of Orleans, seeking among other things, to have the District Attorney and the Foreman of the Grand Jury state the crime being investigated in respect to which Chandler was sought to be questioned, or alternatively, to quash the subpoena, and to recuse Garrison as District Attorney and legal advisor to the Grand Jury. When the District Court denied all relief prayed for, Chandler unsuccessfully sought review on writs to the Supreme Court of Louisiana.

On October 13, 1967 District Attorney Garrison wrote Richard Billings, Associate Editor of Life Magazine, a lengthy letter taking issue with its "organized crime" series. In the letter, Garrison stated: "The Grand Jury inquiry has indicated that there is no basis in fact supporting the allegations of Life concerning systematic racketeering activities in New Orleans." He further stated: "We have called every witness who conceivably might have information concerning racketeering operations in the City—from Carlos Marcello to the Governor of Louisiana."

The letter also contains Garrison's comment: "On the basis of the Grand Jury inquiry up to this point, it appears that your articles have reflected unjustly on the City of New Orleans. What they have done to me and the office which I have worked to build for the last five years is beyond my capacity to describe."

The letter points out that Billings should have been aware that he was not getting accurate information from his sources and charges Billings with having "failed to discharge your supervisory responsibilities effectively."

Although on trial Garrison said Chandler could be a source of the material appearing in the Life articles, Garrison's letter leaves no doubt that he regarded Chandler an actual source. In the letter, Garrison charged that Chandler had not told Life the truth concerning the "fixing" of a case by the District Attorney's former chief investigator and that Chandler's statements to Life concerning the operation of a bookie ring in a New Orleans hotel were totally untrue.

When referring to Chandler's statements to Billings concerning the alleged case "fixing", Garrison stated: "This appears to be another example of the tendency of your New Orleans reporter to fabricate stories which are totally untrue and then to present them as fact." Despite his denials on trial, that statement epitomizes Garrison's evaluation of Chandler's veracity.

Notwithstanding the declaration that the Grand Jury investigation showed there was no basis for Life's allegations, Garrison informed Billings that the Grand Jury "now wants to hear from Dave Chandler * * *" who, "* * * as long as [he] tells the truth * * *", would "be treated with complete fairness and courtesy." (Garrison's letter to Billings is annexed hereto as Appendix A.)

On October 23, 1967, Chief Assistant District Attorney Charles R. Ward in a television interview in New Orleans declared in substance that David Chandler is a liar and insisted that no "organized crime" exists in New Orleans. Ward later testified that he has nothing but personal animosity toward the plaintiff. His animosity is so great that he said he would recuse himself de facto but not de jure in any matter involving the plaintiff.

## RELIEF SOUGHT

In his complaint, as amended on October 25, 1967, plaintiff invokes the jurisdiction of this Court "pursuant to 28 U.S.C. 134(3) and (4) [1343], 2281, 2283–84, 42 U.S.C. 1983 and 1985(3) and the Constitution of the United States, particularly, without limitation, the First, Fifth, Sixth and Fourteenth Amendments," as these amendments are implemented through Gideon v. Wain-

wright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733 (1963); Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). He alleges that he has exhausted all state court remedies and prays that:

1. A Three-Judge Court be organized to hear and determine the issues herein;

2. Articles 433 and 434 of the Louisiana Code of Criminal Procedure relating to the persons who may be present during Grand Jury sessions and the secrecy of such session and LSA–R.S. 14:123 through 14:128 relating to perjury and false swearing including 14:126.2 relating to the making of false statements asserting the denial of constitutional rights be decreed unconstitutional;

3. The subpoena served on him on October 6, 1967, returnable October 11, 1967, be quashed;

4. The defendants be permanently restrained (a) from enforcing or compelling compliance with the subpoena, or alternatively, (b) that a permanent mandatory injunction issue compelling and requiring the defendants to allow plaintiff to have counsel present during any Grand Jury appearance required by the subpoena and (c) prohibiting them from prosecuting plaintiff pursuant to LSA–R.S. 14:123–14:128 and 14:126.2.

He also sought a temporary restraining order, without notice or hearing, and a preliminary injunction in the form of the permanent relief sought. In addition, he prayed for consolidation of trial of the merits and his application for a preliminary injunction pursuant to Rule 65(a) (2) F.R.Civ.P.

The temporary restraining order was denied on October 27, 1967 after a hearing by Judge James A. Comiskey. An effort to appeal from Judge Comiskey's order to the U.S. Court of Appeals, Fifth Circuit, was unsuccessful as was plaintiff's effort to have the Court of Appeals issue a writ of mandamus to the District Court.

On November 6, 1967, the Honorable John R. Brown, Chief Judge, U.S. Court of Appeals, Fifth Circuit, ordered a Three-Judge Court organized, but reserved to the Three-Judge Court the right to determine whether this case is properly one for a Three-Judge Court.

On November 8, 1967, the Three-Judge Court heard plaintiff's application for a preliminary and permanent injunction. The Attorney General of Louisiana, for himself and the Governor of Louisiana, waived notice of the hearing required by 28 U.S.C. § 2284(2) and did not participate in the case.

On plaintiff's motion, the case was ordered reopened, and on November 27, 1967, a further hearing was held.

## CONTENTIONS OF THE PARTIES

The plaintiff filed this suit to avoid appearing before the grand jury for a variety of reasons, or alternatively, if required to appear, then plaintiff wants his counsel with him before the grand jury. Factually, the gist of plaintiff's resistance to a grand jury appearance is that he is convinced that the defendants, principally the District Attorney, are using the grand jury as a vehicle to charge him with perjury or false swearing. The plaintiff contends that the District Attorney and his staff are anxious to charge the plaintiff with some kind of crime, preferably a perjury type, to discredit plaintiff who is writing about organized crime in Louisiana where the District Attorney prosecutes crime, but apparently cannot find any organized crime to prosecute. The plaintiff alleges that he fears indictment for alleged violations of certain Louisiana false swearing laws, namely LSA–R.S. 14:123 (Perjury), 14:124 (Inconsistent statements—Perjury), 14:125 (False swearing), 14:126 (Inconsistent statements—false swearing), 14:126.1 (False statements to public officials), and 14:126.2 (False statements about denial of constitutional rights). The thrust of plaintiff's position is that his January,

1967 interrogation under oath by Charles Ward, First Assistant District Attorney, will be the basis of charges against him. In effect, plaintiff argues, he is a suspect for a false swearing crime committed in January of 1967. However, plaintiff goes further and contends that his appearance before the grand jury could result in testimony which the District Attorney thinks is perjurious in view of the District Attorney and his First Assistant's belief that the plaintiff is a liar about the existence of organized crime in the New Orleans area. Chandler contends, in view of the District Attorney's office feelings toward him and Garrison's claims that the Life articles have been proven untrue and he has been branded a liar by both Garrison and Ward, his grand jury appearance is designed to entrap him and to lay the foundation for a charge or charges of perjury or false swearing against him. He further points out that his presence before the grand jury would deprive him of the assistance of counsel.[1] The defendants' position is simple. They contend that the plaintiff's rights, if any, can be fully and completely protected when he appears before the grand jury without counsel by exercising his rights under the Fifth Amendment against self-incrimination.

On or about September 27, 1967, Governor John J. McKeithen of Louisiana, heading a delegation, which included the President of the Metropolitan Crime Commission, met in New York with the editors of Life Magazine, who made available to the delegation information in its files concerning the crime series. On returning to the State, Governor McKeithen declared he was "convinced" that there was "hard evidence" of organized crime in the State.

On September 28, 1967, Chandler was made a Special Officer of the Louisiana State Police and was appointed by Governor McKeithen to his staff as a Special Investigator of organized crime.

On that day, Governor McKeithen and Garrison had a telephone conversation concerning Chandler. Garrison's version[2] of the conversation was that the Governor called him and stated that Chandler had reported his fears that Garrison was going to put him, Chandler, in jail. When the Governor asked him if he was going to have Chandler prosecuted or charged with perjury or false swearing Garrison denied that he answered: "You're reading my mind, but that's what I intend to do." Garrison did, however, recall that he used the phrase, "You must be reading my mind" in some way but claimed not to recall how, further claiming his use of the phrase had "no connotation."

Garrison also denied that the Governor, as a personal favor, asked him not to have Chandler arrested while Chandler was helping the Governor or that he had agreed thereto. Garrison's version was that the Governor expressed the hope that he would not arrest Chandler because that would create a problem for the Governor with Life Magazine. And when Garrison disclaimed any "special plans to arrest him at all," the Governor attempted to get his commitment that he would not charge Chandler with anything, to which Garrison said he replied, "How can I tell you that when I don't know what is going to happen." Garrison stated he did commit himself not to charge or arrest Chandler without first telling the Governor.

Garrison further stated he told the Governor, concerning the Governor's advice to him that Chandler feared Garrison was going to put him in jail, that "There is no reason for him to fear going to jail, because all he has to do is answer the questions in front of the

---

[1]. Article 433, La.Cr.Code provides the intentional presence of anyone other than the District Attorney, his assistants, the witness, reporter and interpreter is prohibited and would be constructive contempt of Court.

[2]. Governor McKeithen was not called as a witness and the Court sustained an objection to Chandler's attempt to state what the Governor had told him concerning the conversation.

jury. We do put them in jail if they lie, but I don't expect him to lie in front of the jury."

It is apparent from the evidence that Ward, with respect to the original January 26, 1967 interrogation, believed Chandler did not testify truthfully. However, despite an obvious warning by Ward that perjury charges would or might be based on his testimony and that, therefore, Chandler should have the benefit of counsel in the matter, no such action was taken and on trial herein Ward and Garrison repudiated an intention to institute such charges. Neither the defendant foreman, nor any other member, of the Grand Jury, testified.

Although Ward testified he regards Chandler a liar and acknowledged hostility and animus toward Chandler, he disavowed any intention to entrap Chandler or have him indicted for perjury, no matter whether what he says before the Grand Jury is true or false. Ward further declared it was not his intention to question or charge Chandler concerning any matter which was the subject of his interrogation of Chandler on January 26, 1967, and claimed he would recuse himself as an advisor to the Grand Jury during his interrogation before the Jury, which, he says, would be limited to allegations of organized crime in New Orleans.

Garrison went even further. He testified that neither he nor any of his assistants would be present when Chandler appeared to testify before the Grand Jury, and they would not in advance submit questions to the Jury to be propounded to Chandler.

Ward, who, in addition to being Acting District Attorney when Garrison is out of the City, claims to speak for the District Attorney's office, disagreed with Garrison as to whether Chandler, in the event of his appearance, should be asked to disclose the identity of his confidential informants. Ward maintained he should be required to do so, but would abide by Garrison's orders not to require Chandler to do so. Ward also stated he believes that any person who asserts his Fifth Amendment privilege against self-incrimination (Chandler in the January 26, 1967 interrogation by Ward did so in several instances) should be criticized and castigated and is not entitled to his or the public's respect.

Garrison's public pronouncements of the falsity of the Life articles, reiterated in his October 13, 1967 letter to Life's editor, were reinforced by his trial testimony. Disclaiming that he considers Chandler a liar, but acknowledging that his statements in his letter to Life's editors "means on this occasion, in my judgment, he did not tell the truth * * *," Garrison maintained that if Chandler appears before the Jury and testifies to truth, which he avoided defining as to the allegations of the Life articles and his statements of error therein, he would be treated courteously and have nothing to fear. Garrison declared that his letter speaks for itself, that what he said therein is true and he would retract no statements contained therein.

Garrison testified—and emphasized— that "it just happens to be a matter of fact that a pretty comprehensive inquiry", in which every conceivable relevant witness was called made it clear to him that the Life articles about organized crime in New Orleans were untrue.

If the Life articles were thus disproved, what then would be the purpose of requiring Chandler to appear to testify concerning what he knew of organized crime in New Orleans? Garrison says it is possible—"certainly theoretically possible"—Chandler, Billings, the Life editors, or Sandy Smith, author of the articles [3] could have in-

---

3. Garrison testified he invited Billings and Smith to appear before the Grand Jury, but they refused. He did not re-

sort to the use of the material witness statute (Article 741 of the Louisiana Code of Criminal Procedure) to compel

formation "which we have not." He says, too, that Chandler could be a source of material appearing in the articles.

But he rejected an offer to view and copy Life's files pertaining to the matter. He would not go himself or send a member of his staff to New York for such purposes,[4] unless some new information was developed for the Grand Jury by Life's representative—who was unidentified by Garrison, but presumably he referred to Chandler. He testified that after being told by Billings that they (Life) had given "all the information there was, everything they had" to Governor McKeithen and his delegation, one of whom was Camille Gravel, he contacted Gravel and "got all the information" given by Life and "every bit of information Mr. Gravel had turned out to be incorrect."

The Life files offered to Garrison—and the information given to the McKeithen delegation, which was made available to Garrison by Gravel—would have contained any contribution by Chandler—and more. Presumably, Garrison, as the Grand Jury's legal advisor, imparted to the Jury the information gotten from Gravel. Therefore, it is reasonable to conclude that the already made determination that the Life articles were untrue was based on a consideration of that information and the testimony of all the witnesses who appeared before the Grand Jury.

In Louisiana, a District Attorney, subject only to the authority and supervision of the Attorney General,[5] has entire charge and control of every prosecution instituted or pending in his district, and determines whom, when and how he shall prosecute, Article 61, Louisiana Code of Criminal Procedure. He is the representative of the State before the Grand Jury and is the Jury's legal advisor. Article 64, Louisiana Code of Criminal Procedure. He must be notified of all Grand Jury sessions, has the right to be present, except during deliberations, and *shall* examine witnesses before the Grand Jury. Article 64, supra.

A Louisiana Grand Jury is bound by law to inquire into capital offenses and may, where requested by the District Attorney or ordered by the Court, inquire into other offenses. Article 437, Louisiana Code of Criminal Procedure. Its sessions are secret and only the District Attorney, his assistants, the witness, reporter and an interpreter, when necessary, may be present. Articles 433 and 434, Louisiana Code of Criminal Procedure. Upon the request of the Grand Jury or the District Attorney, the Court will issue subpoenas for a witness to appear before the Grand Jury for questioning. Article 439, Louisiana Code of Criminal Procedure. The Grand Jury is empowered to act in one of three ways: by returning a true bill, by returning a no true bill and by pretermitting entirely the matter being investigated. Article 444, Louisiana Code of Criminal Procedure. When the evidence, if unexplained or uncontradicted, in its judgment warrants conviction, the Grand Jury shall find an indictment. Article 443, Louisiana Code of Criminal Procedure.

In view of the duties imposed by law on the Grand Jury, it is difficult to understand how Garrison and Ward could properly and effectively give assurances that Chandler, in his appearance before the Jury, would be questioned only concerning organized crime in New Orleans and would not be asked to disclose the names of his informants, who, Ward said, Chandler should be required

---

their attendance because, he claims, he preferred to invite them in order to show no bias or rancor.

4. Garrison and Billings discussed the Life articles in a telephone conversation in New York in September, 1967, while Chandler was in Billings' office. For

about three minutes Chandler heard both sides of the one-hour conversation, during which Garrison declined Billings' proposal for a meeting with him and Chandler to discuss the New Orleans situation.

5. Article 7, Sec. 56, La.Constitution, Article 62 C.Cr.P.

to disclose.[6] Even more perplexing is the value of such assurances by the District Attorney and his assistant when viewed in the light of the fact that neither Garrison, nor any of his assistants, would be present with the Grand Jury when it interrogates Chandler.

We do not understand how Garrison and his assistants can properly fail to be present as the Grand Jury's legal advisor and an examiner of witnesses before the Jury (Article 64, Louisiana Code of Criminal Procedure).

Chandler may or may not be questioned by the Grand Jury concerning the matters which were the subject of his January 26, 1967 interrogation by Ward. There is no doubt that he would be questioned concerning organized crime in New Orleans. Thus, Chandler would find himself in a most precarious position before the Grand Jury, since the District Attorney long ago determined that no organized crime exists in New Orleans having also had the benefit of all information in Life's files on this subject.

Ward acknowledged animus and hostility toward Chandler; Garrison has stated his lack of regard for Chandler's veracity; Garrison has stated his lack of regard for the truthfulness of the very testimony being sought from Chandler by this Grand Jury appearance; Garrison and Ward have made various public statements that no organized crime exists in New Orleans. Therefore, we believe the climate is such under the facts of this case that Chandler's fear of prospective prosecution for perjury or false swearing, as a consequence of his appearance before the Grand Jury, is well founded.[7]

■ The facts and circumstances, as disclosed by the record in this case, have been set forth in considerable detail by us because we view them as exceptional and unusual. The Supreme Court's landmark decisions in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and its forerunner Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) brought wholly new dimensions to the Fifth Amendment privilege against self-incrimination, as well as to the Sixth Amendment right to counsel in a criminal case. In Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), the Court held that "the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgement by the States." (378 U.S. at 6, 84 S.Ct. at 1492)

In the recent case of Sheridan v. Garrison, E.D.La., 1967, 273 F.Supp. 673, Judge Rubin of this Court granted an injunction against the New Orleans District Attorney Garrison and the foreman of the Orleans Parish, Louisiana, Grand Jury against a subpoena requiring plaintiff's appearance before the Grand Jury. In its opinion, the Court said (273 F.Supp. at 683): " * * * federal courts, even prior to the *Escobedo* decision, expressed concern about the propriety of the District Attorney's calling before a grand jury as a witness a person who was the subject of an investigation but had not yet been charged formally with an offense. * * * The decisions in the *Escobedo* and *Miranda* cases announce in forceful terms the right of a person charged with a crime to the presence of his counsel at any time that he is questioned and his right to speak or to remain silent at any time that he is questioned."

■ The Court also said (273 F.Supp. at 678): " * * * the mandate of these decisions [i. e. Escobedo and Miranda] is clear: the person charged with a crime

---

6. Garrison and Ward disagree, at least as to Chandler. Garrison ordered that Chandler should not be required to disclose his informants.

7. P.–25–Interview of Charles Ward by WDSU news reporter; P–24–New Or- leans States Item news stories in issues of September 12, 13 and 28, 1967; Chandler 2–New Orleans States Item issue of November 9, 1967.

has the right to choose either to speak or not to speak, and, if he elects to remain silent, he cannot be compelled to speak, nor can his refusal be later considered against him. If, as set forth in *Escobedo,* a person accused of a crime must be advised of an absolute constitutional right to remain silent in any police investigation, there is all the more reason why he should have an absolute right not to testify under oath before a grand jury in the absence of his lawyer."

■ There is good reason to believe that since *Escobedo* and *Miranda,* a Grand Jury witness, who is a potential defendant, may have the right to the presence of counsel before the Grand Jury to assist him in the protection of his constitutional rights, especially those guaranteed by the Fifth Amendment. See Meshbesher, Right to Counsel Before Grand Jury, 41 F.R.D. 189 (1966); Sobel, The New Confession Standards "Miranda v. Arizona" (Gould Publications, 1966), pp. 97–98. But we do not decide that question here or intimate any conclusion to that difficult legal problem since this case can and should be disposed of without passing on the alleged unconstitutionality of those Louisiana statutes under attack. It is a settled rule that the constitutionality of statutes will not be judicially determined unless such determination cannot be avoided. Woodard v. General Motors Corp., 5 Cir., 1962, 298 F.2d 121, 127; Reynolds v. Sims, 377 U.S. 533, 584, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964).

■ The unusual and exceptional circumstances here warrant an exercise of our equity powers to prevent oppression to Chandler and to further the ends of justice by protecting Chandler's basic federal constitutional rights. It is clear that no useful public purpose is to be served by requiring plaintiff to respond to the Grand Jury subpoena. Louisiana law does not permit the presence of counsel with the witness in an appearance before the Grand Jury. The facts disclose quite clearly that the prosecutor has no faith in the truthfulness of the witness, having so declared publicly and in writing. It is also plain that the prosecutor is satisfied, as a result of his intensive investigation, that there is no organized crime in New Orleans such as the Life Magazine articles charge. It would be expected that Chandler's testimony under oath would be at variance with that conclusion. The appearance of plaintiff before the Grand Jury, without the presence of counsel, exposes him to the real possibility of indictment for perjury, false swearing, or both. Chandler is, therefore, a very real potential defendant in a possible criminal prosecution which either the District Attorney or the Grand Jury may decide to initiate against him. He has the right to remain silent under these conditions and should not be obliged to place himself in the perilous position of possible incrimination or be compelled to give evidence which, in the view of the District Attorney and the Grand Jury, might incriminate him.

The special circumstances of this case demand that plaintiff's federal constitutional rights be maintained and preserved. In our view they can only be assured by an injunction against the enforcement of the Grand Jury subpoena. The Court is, therefore, obliged to take such action as the facts require. Cf. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

However, since the case may be disposed of without reaching the serious constitutional questions which plaintiff raises, the three-judge statutory Court is hereby dissolved and the case returned to Judge James A. Comiskey from whom the matter initiated, for further handling. Cf. McWood Corporation v. State Corporation Com'n of N. M., D.C., D.N.Mex., 1965, 237 F.Supp. 963; Wright on Federal Courts, p. 164.

COMISKEY, District Judge.

Considering the foregoing per curiam and for the reasons there well expressed,

which are herewith adopted by reference as our own findings of fact and conclusions of law, a preliminary and permanent injunction will be issued forthwith against the defendants restraining the enforcement of the subpoena or any other such subpoena hereafter issued in lieu thereof directing plaintiff David L. Chandler's appearance before the Orleans Parish Grand Jury in connection with the subject matter of plaintiff's complaint.

The further relief prayed for is denied. Counsel for plaintiff will submit proposed decree after service of copy on counsel for defendants.

Appendix A
DISTRICT ATTORNEY
Parish of Orleans
State of Louisiana
2700 Tulane Avenue
New Orleans 70119

Jim Garrison
District Attorney

October 13, 1967

Mr. Richard Billings, Associate Editor
Life Magazine
Time and Life Building
Rockefeller Center
New York, New York

Dear Dick:

By now I am sure you are aware that Life Magazine has made a number of serious factual errors in its recent statements concerning organized crime in New Orleans. It appears to me that you should have been aware at the outset that you were not getting accurate information from your sources when virtually every fact brought up in our presence by Sandy Smith turned out to be either completely wrong or badly distorted—a condition which I made plain to you within a matter of days.

The Grand Jury inquiry has indicated that there is no basis in fact supporting the allegations of Life concerning systematic racketeering activities in New Orleans. Even witnesses who made it apparent that they would have to take the Fifth Amendment if questioned about other jurisdictions testified that with regard to Orleans Parish the Life articles were totally untrue and based on false information. Some of the individuals supposedly operating "bookie rings" in the Fontainebleau have not been in that hotel for over a year nor has anyone working for them ever frequented the hotel. As I informed you earlier, the management of the hotel has never seen these individuals or any of their supposed associates hanging around the hotel at any time. What the Life stories seem to have done, as far as we are able to determine, was to lift some gambling operations which were confined to St. Bernard Parish out of that parish and place them in the Fontainebleau in the City of New Orleans—somewhat in the manner that Dorothy was lifted, house and all, from Kansas and moved over into Oz by the tornado.

Naturally, the members of the Orleans Parish Grand Jury now want to hear from Dave Chandler, Life's representative in New Orleans, in order to see if there are any stones unturned and if he has some special information which all of the other witnesses called do not have. Needless to say, as long as Dave tells the truth—for that is all that the Grand Jury and my staff are interested in—he will be treated with complete fairness and courtesy.

Incidentally, regarding Dave, I have confirmed that—as I indicated to you earlier—he did not tell you the truth about the "rumor" that Pershing Gervais supposedly fixed the case for Wray Gill when Ferrie was arrested by our office after the assassination (which rumor, I might add, I had never heard before until you advised me that you had learned it from Dave Chandler). By now you should have received a copy of our questioning of Chandler concerning his unsupported comment that Gervais had received money from Gill in order to help Ferrie in a case involving a charge of intimidation several years earlier. It is apparent that what your reporter did in this instance was to move the rumor forward in time and to attach it to our 1963 arrest of Ferrie, thus creating the infer-

ence that the real facts of the assassination have remained concealed because of this "fix". Actually, none of the young men associated with Ferrie in the 1963 matter had visas nor had there ever been an inference of any kind that anyone in that group had visas so that they might be able to leave the country quickly. Gervais had no connection with the case and has never at any time been assigned to any aspect of the Kennedy investigation. This appears to be another example of the tendency of your New Orleans reporter to fabricate stories which are totally untrue and then to present them as fact.

Frankly, I do not understand how you have been unable to see how these statements by your man in New Orleans were totally untrue. Above all, it is hard for me to understand what would allow you to think that I would let a single "bookie ring" operate anywhere in the City much less allow three of them to flourish in one hotel. It is all the more difficult for me to understand when I spent hours with you explaining how we had cracked down on every type of organized crime operation—without exception—and have made more progress in this regard in our five years in office than had been made in the previous quarter century. In my judgment you are an intelligent and competent man but you have, in this instance, failed to discharge your supervisory responsibilities effectively and then, consequently, have depicted New Orleans as a center of organized crime and my office as an incompetent, lax and corrupt office.

In order to give Life Magazine every opportunity to document its allegations—or to present any added evidence which it may have concerning any type of syndicated crimes whatsoever—I invite you and Sandy Smith to New Orleans to testify before the Grand Jury. Again, our sole interest is in obtaining the truth. You will be allowed to present any kind of evidence you have, without any restriction whatsoever, concerning the possible existence of organized crime in New Orleans or concerning collusion of public officials with racketeers. If you

are as interested as we are in determining the truth then you should regard this as an opportunity. I might add that I have voluntarily appeared before the Grand Jury—a brand-new Grand Jury whose members I do not know—and testified under oath on every aspect of this matter. We have called every witness who conceivably might have information concerning racketeering operations in the City—from Carlos Marcello to the Governor of Louisiana.

On the basis of the Grand Jury inquiry up to this point, it appears that your articles have reflected unjustly on the City of New Orleans. What they have done to me and the office which I have worked to build for the last five years is beyond my capacity to describe. I can only say that I am very disappointed that you did not exercise better judgment in your supervision of these articles.

> Sincerely,
> (s) JIM GARRISON
> District Attorney

JG:lcs